**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| CUROLOGY, INC.<br><br>      Plaintiff,<br><br>v.<br><br>PHARMCO LABORATORIES, INC.<br><br>      Defendant. | Case No. _____<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF CUROLOGY, INC.'S COMPLAINT**

Plaintiff Curology, Inc., in its complaint against Defendant Pharmco Laboratories, Inc., hereby alleges as follows:

**PARTIES**

1. Plaintiff Curology, Inc. ("Curology") is a Delaware corporation with its principal place of business in San Diego, California.

2. Defendant Pharmco Laboratories, Inc. ("Pharmco") is a Florida corporation with its principal place of business in Titusville, Florida.

**JURISDICTION & VENUE**

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is a complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. This Court has personal jurisdiction over Pharmco because it is a citizen of Florida. Further, this Court has personal jurisdiction over Pharmco,

and venue is proper in this Court, because this dispute arises under a contract in which the parties mutually consented to jurisdiction and venue in the Middle District of Florida, Orlando Division.

## ALLEGATIONS COMMON TO ALL CLAIMS

### Introduction

5.      Curology markets and sells skin care products, including an over-the-counter acne cleanser formulation (the "Acne Cleanser") that contains the drug benzoyl peroxide ("BPO").  Curology engages contract manufacturers to produce its Acne Cleanser, which in turn it sells through supply contracts with large retailers.

6.      Pharmco is a contract manufacturer of consumer drug and health care products.  Pharmco holds itself out as "a leading U.S. manufacturer specializing in OTC drug products, personal care, skincare, haircare, pet care, and cosmetic formulations" with more than forty-five years of experience and an "FDA-registered cGMP-compliant facility in Titusville, Florida."[1]

7.      On or about July 13, 2023, Curology and Pharmco entered into a written manufacturing agreement (the "Agreement" or "MA"), whereby Curology engaged Pharmco to manufacture and supply the Acne Cleanser.[2]

8.      In 2025, Curology discovered that Pharmco completely ignored one of the main risks associated with manufacturing BPO acne products, *i.e.*, the risk that BPO may degrade into benzene throughout the shelf-life of the product.  As

---

[1] https://pharmcolabs.com/about/ (last accessed April 9, 2026).

[2] A true and correct copy of the Agreement is attached to this Complaint as Exhibit A.

an established contract manufacturer, Pharmco undoubtedly was aware of the benzene degradation risk, which had received increased attention by independent laboratories and regulators within the industry. Further, as an established contract manufacturer, Pharmco undoubtedly knew that it was responsible for conducting adequate testing to ensure that its BPO products would remain pure during their entire shelf-life, especially from impurities that may form over time, like benzene.

9. Ignoring these well-known risks, Pharmco did not implement any stability testing to measure benzene degradation levels. In fact, Pharmco only *began* to address the risk after Curology brought up an FDA press release issued on March 11, 2025. That FDA press release, however, reported on *responsive measures* taken by the FDA and other companies in the industry—in response to concerns raised in *early 2024* about benzene degradation in BPO acne products. While it defies credulity, Pharmco contends that it had no reason to consider benzene degradation testing until after it was made aware of the FDA's press release on March 11, 2025.

10. Pharmco began to order outside testing in April 2025, since it had no validated processes in place. By July 2025, Pharmco shared the results of its stability testing with Curology, which revealed elevated levels of benzene formation, such that Pharmco could not ensure the purity of its formulations at one year post-production (much less at two years, as required under the parties' agreement). Accordingly, Curology had no choice but to discontinue the Acne Cleanser product and accelerate the development of an alternative formulation.

11.    Through its grossly negligent misconduct, Pharmco has breached multiple warranties and product quality guarantees set forth in the parties' agreement.  As a result, Curology has lost millions of dollars in revenue from its retail partners, suffered reputational harms, incurred costs related to the recall and defective inventory, and incurred costs to mitigate its damages, *i.e.*, related to the accelerated development of a new formulation.

**Relevant Provisions of the Agreement**

12.    On or around July 13, 2023, the parties entered into the Agreement, which sets forth their respective rights and obligations related to Pharmco's manufacture of the Acne Cleanser for Curology.

13.    Pursuant to Section 18.1 of the Agreement, Pharmco warranted that the Acne Cleanser would be "produced in accordance with the stability standards to have a two-year shelf life."  MA § 18.1.

14.    Pharmco further warranted that the Acne Cleanser would meet various quality requirements during that two-year shelf-life period, including compliance with applicable current Good Manufacturing Processes ("CGMP"):

- "The Products and any and all packaging, packaging components, articles, chemicals or other components or compositions forming a part thereof sold and/or delivered to Company hereunder shall be in compliance with all Specifications and Quality Requirements applicable to such Products" (MA § 18.1.1);

- "The Product and their manufacture meet or exceed Company's Quality Requirements" (MA § 18.1.2);[3]

---

[3] "Quality Requirements" are defined in Section 20.1 of the Agreement as follows: "Manufacturer shall produce the Products in accordance with all federal, state, and local regulations and applicable current CGMP regulations and in accordance with the quality requirements applicable to such products as set forth on Exhibit 3 ('Quality Requirements')."

- "The Products and their manufacture comply with all Laws" (MA § 18.1.3);
- "The Products will be manufactured in accordance with all applicable Good Manufacturing Practices regulations promulgated by the U.S. Food and Drug Administration applicable to Manufacturer's performance of its obligations hereunder, as well as to the Products supplied by Manufacturer hereunder, including without limitation CGMP and Laws, as each of them may be amended from time to time, and Manufacturer shall provide proof of such compliance upon Company's reasonable written request" (MA § 18.1.4);
- "Documentation provided or representations or claims made about Products by Manufacturer or agreed to by Manufacturer, including without limitation any certificates of analysis, test results, certifications or similar documentation related to Products, shall be truthful, not misleading, and backed by appropriate substantiation, as may be necessary or required under applicable Law" (MA § 18.1.5).

15.     Among the applicable CGMP requirements that were incorporated into the Agreement (21 C.F.R. §§ 210, 211), Pharmco was obligated to set expiration dates supported by adequate stability testing to ensure, *inter alia*, that the Acne Cleanser would remain free from impurities throughout its entire shelf-life. *See, e.g.,* 21 C.F.R. §§ 211.84, 211.137, 211.160, 211.165, 211.166. Adequate stability testing processes must cover all expected storage, handling and use conditions, and it must be conducted using "reliable, meaningful, and specific methods." 21 C.F.R. § 211.166. Where, as here, it is well known that certain chemical ingredients can degrade or change due to environmental conditions or the passage of time, stability testing cannot overlook such factors.

16.     Under Section 19 of the Agreement, Pharmco was responsible for all costs and expenses related to a recall that was caused by Pharmco's failure to comply with applicable quality requirements:

> In the event that the cause or reason for any such Recall arises from or is the result of any defect in the manufacturing, packaging, handling, or storing of the recalled Product by Manufacturer, the failure of the Product to conform to Product Specifications, Quality Requirements or applicable Law, or the grossly

negligent acts or omissions of willful misconduct of Manufacturer, Manufacturer shall be responsible for costs and expenses incurred by Manufacturer or Company in connection therewith.

MA § 19.4.  Section 19 of the Agreement also provides that "expenses of a recall shall include" the "reasonable expenses of notification and destruction or return of the Recalled Product and replacement thereof and all other reasonable costs incurred in connection with such Recall."  MA § 19.5.

### The Well-Known Risk of Benzene Degradation

17.    Benzene is a known carcinogen.  The FDA recognizes benzene as a "Class 1 solvent" that "should not be used in the manufacture of drug substances, excipients, and drug products."  Where the presence of benzene is "unavoidable in order to produce a drug product with significant therapeutic advance," the FDA requires manufacturers to have controls in place to ensure that benzene levels do not surpass two parts-per-million ("ppm").  Since at least 2022, the FDA has advised manufacturers not to release, and to initiate voluntary recalls for, any drug product batches with benzene levels above 2 ppm.

18.    BPO is a commonly used active ingredient in many prescription and over-the-counter acne treatment products.  It is well known that BPO has the potential to degrade into benzene under certain conditions (*e.g.*, temperature) over the shelf-life of the product.  In fact, the degradation of BPO into benzene was reported in the scientific literature as early as 1936.[4]  Accordingly, it is manifest that manufacturers of BPO-containing products must implement adequate stability testing to ensure that the product remains free from benzene

---

[4] H. Erlenmeyer and W. Schoenauer, *Uber die thermische Zersetzung von Di-acyl-peroxyden*, HELU. CHIM. ACTA, 19, 336 (1936).

contamination through the expiration date for that product.

19. Starting in March 2024, independent laboratories filed citizen petitions and submitted testing results to the FDA, raising concerns about elevated levels of benzene in dozens of BPO acne products, due to benzene degradation. The submissions prompted the FDA to conduct its own testing of ninety-five commercially available BPO acne products. On March 11, 2025, the FDA issued a public alert regarding its test results, which found elevated benzene levels in six BPO acne products. As reported by the FDA, recalls were initiated for those six products, and a seventh company initiated a voluntary recall based on its own testing.

20. Noting that the incidence of benzene contamination had decreased significantly by the time the FDA released its own testing results in March 2025—versus the earlier testing results released in March 2024—Dr. Christopher Bunick from the Yale School of Medicine attributed the decrease to industry action in the interim period: "Companies had time to go back and assess their manufacturing and quality control processes, and fix potential problems."[5]

**Pharmco Ignores Benzene Degradation Risks and Breaches the Agreement**

21. While the rest of the industry was busy addressing the risk of benzene degradation since at least early 2024, Pharmco apparently did nothing.

22. On March 17, 2025, Curology scheduled a call with Pharmco to discuss the FDA's March 11, 2025 press release. During the call, Curology was

---

[5] Blackman, Isabella. *"Why the FDA Recalled Six Popular Acne Products,"* Yale School of Medicine (May 27, 2025).

shocked to learn that Pharmco lacked any validated processes to test benzene levels and was not testing its BPO products for benzene degradation levels.

23.     Pharmco only began to explore testing options as a result of the March 17, 2025 conference call with Curology, even though Pharmco was required to have validated processes implemented pursuant to the quality requirements in the Agreement, including to support a two-year shelf life and purity standards.  Thereby, Pharmco breached Sections 18 and 20.1 of the Agreement, and the batches of Acne Cleanser that Pharmco manufactured previously were all "Defective Products" under the Agreement.

24.     During April 2025, Pharmco downplayed the significance of its lack of testing processes, but it agreed to engage an outside laboratory to conduct testing on various batches of the Acne Cleanser product.  Notwithstanding its previous lack of concern toward the testing issues, on July 10, 2025, Pharmco notified Curology that it had received "test results" which "did not come back as favorable as we had hoped."  Specifically, the tests revealed a concerning level of benzene formation in the tested samples, such that Pharmco could not ensure benzene levels would remain below the FDA's upper limit (2 ppm) after one year—even though Pharmco was required to have validated stability testing demonstrating purity for a two-year shelf-life.

25.     Based on the July 2025 test results, Pharmco recommended that Curology not "mov[e] forward" with the Acne Cleanser formulations.  Pharmco also had no timeline for when it may have a viable replacement formulation that would meet the quality standards under the Agreement.  Nevertheless, to date,

Pharmco has refused to acknowledge that the Acne Cleanser batches are "Defective" under the Agreement, and it has insisted that Curology must accept delivery of the products.

**Curology Discontinues the Acne Cleanser and Accelerates Development of an Alternative Formulation to Mitigate Its Losses**

26.     Pharmco's gross negligence left Curology in a precarious situation with its retail partners.  On the one hand, Curology could not begin distributing the Acne Cleanser to its retail partners, since Pharmco could not ensure that it would be free from benzene, a known carcinogen, during the shelf-life of the product.  Indeed, based on FDA guidance that had been in place since 2022, Curology could not allow the Acne Cleanser to enter the market.  On the other hand, competition for shelf space with retail partners is fierce in the skincare product industry, and Curology risked losing important relationships with retailers if there were supply disruptions.  Left with no other viable alternative, and to mitigate its losses, Curology was forced to discontinue the Acne Cleanser and accelerate plans to develop an alternative formulation to meet the demands of its retail partners (in addition to other concessions it would have to make to those partners).

27.     Pharmco's conduct has caused and continues to cause financial harm to Curology.  For example, Pharmco's breach of the quality warranties in the Agreement have caused Curology to incur multiple categories of losses, including without limitation: cancelled purchase orders, existing product that cannot be sold, costs to dispose of existing product, lost revenues/profits, costs

of developing an alternative formulation, and monetary penalties owed to third parties. Pharmco is responsible for bearing these costs and expenses under the Agreement, but it has refused to take any responsibility to date.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

28. Curology hereby repeats and realleges the allegations in paragraphs 1 through 27 as if fully set forth herein.

29. Curology and Pharmco, for good valuable consideration, entered into the Agreement, which is a valid and enforceable contract, for the manufacture and supply of acne cleanser products.

30. Pharmco has failed to meet the shelf-life and quality requirements and/or warranties set forth in the Agreement, in breach of the express terms of the parties' contract.

31. Further, Pharmco's misconduct was so reckless or wanting in care that it constitutes a conscious disregard or indifference to the life, safety, or rights of persons exposed to its conduct, constituting gross negligence.

32. Curology substantially performed, or is excused from performing, its obligations under the parties' contract.

33. Pharmco's breach of contract has caused Curology to incur millions in damages, in an amount to be proven at trial, which in any event exceeds $75,000.

## PRAYER FOR RELIEF

-10-

WHEREFORE, Curology demands judgment against Pharmco as follows:

a)    an order entering judgment in favor of Curology against Pharmco;

b)    an order awarding Curology damages in an amount to be determined at trial;

c)    an order awarding Curology pre-judgment and post-judgment interest;

d)    an order awarding Curology punitive damages;

e)    an order awarding Curology reasonable attorneys' fees and costs; and

f)    for such additional relief as may be just, equitable and appropriate.

Dated: April 30, 2026

Descalzo Law P.A.
2 South Biscayne Blvd., Suite 2530
Miami, Florida 33131
Telephone: 305-489-1018
Facsimile:          305-489-3386
By: */s/ Marissel Descalzo*
**Marissel Descalzo, Esq.**
Florida Bar No. 0669318
md@DescalzoLaw.com

Wilson, Sonsini, Goodrich & Rosati, P.A.
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone: (650) 493-9300
By: /s/ Dylan J. Liddiard
*Dylan J. Liddiard, Esq.
*Pending Pro Hac Vice Admission*
dliddiard@wsgr.com
*Attorneys for Plaintiff Curology, Inc.*